STRATHIE, James, on behalf of himself and all others similarly situated

**v.**

**DEPARTMENT OF TRANSPORTATION, Larsen, Thomas, Acting Secretary of Transportation and Secretary of Transportation Designee, individually and in his official capacity, and Gaffney, Francis, Director, Bureau of Traffic Safety, individually and in his official capacity, and McElhaney, John F., Chief, Public Transportation Division, individually and in his official capacity, and Department of Education, Commonwealth of Pennsylvania, and Scanlon, Robert G., Secretary of Education, individually and in his official capacity, and Council Rock School District, their officers and agents, including but not limited to Byrne, John, Superintendent, Council Rock School District, individually and in his own capacity.**

Appeal of James STRATHIE.

No. 82–1698.

United States Court of Appeals, Third Circuit.

Argued July 11, 1983.
Decided Sept. 8, 1983.

Stephen F. Gold (argued), American Civil Liberties Foundation of Pennsylvania, Seth F. Kreimer, Susan Hirsch, Southeastern Pennsylvania Legal Services For The Deaf, Philadelphia, Pa., Gary Finder, Law Student, for appellant.

LeRoy S. Zimmerman, Atty. Gen., Carl Vaccaro (argued), Deputy Atty. Gen., Philadelphia, Pa., for appellees.

Before SEITZ, Chief Judge, and SLOVITER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

James Strathie appeals an order of the district court granting judgment in favor of appellees in his civil rights, 547 F.Supp. 1367, suit after a final hearing. The district court exercised jurisdiction under 28 U.S.C. § 1331 and § 1343. This Court has jurisdiction under 28 U.S.C. § 1291 (1976).

### I.

The district court found the following facts, which are undisputed on appeal. Appellant Strathie was hired and trained as a school bus driver by Van Trans, Inc., a private bus company which provides transportation for students in certain Pennsylvania public school districts. After completing his training, Strathie took and passed the school bus driver's license test required by the Pennsylvania Department of Transportation. Strathie was issued a Class 4 license, which authorized him to drive a school bus.

After working for Van Trans as a school bus driver for one day, Strathie was notified by the Department of Transportation that his Class 4 license was suspended indefinitely and until his competency was established. The reason for the suspension was that Strathie wore a hearing aid, in violation of one of the Department's regulations, 67 Pa.Code § 71.3(b)(5).[1] This regulation provides that in order to obtain a school bus .driver's license, an applicant must have "[n]o hearing loss greater than 25 decibels at frequencies of 500, 1,000, and 2,000 in the better ear, without a hearing aid." The regulation was formulated by the Medical Advisory Board of the Department of Transportation, and adopted by the Department effective July 1, 1970.

---

1. The Pennsylvania Department of Education has adopted as part of its own regulations the requirement that school districts furnishing pupil transportation service shall comply in every respect with ... the "regulations of the Bureau of Traffic Safety of the Department of Transportation established by the Commonwealth." 22 Pa.Code § 23.1 (1983).

At the time his school bus driver's license was suspended, Strathie was in every respect other than his hearing, qualified under Department of Transportation regulations to continue to be licensed to drive a school bus. With the use of his hearing aid, Strathie's hearing is corrected within the decibel requirements of 67 Pa.Code § 71.-3(b)(5).

On February 9, 1979, Strathie filed a class action complaint in the district court, naming as defendants the Department of Transportation, the Pennsylvania Department of Education, and five named officials of those agencies. The complaint charges that defendants' suspension of the school bus driver's licenses of the class violated the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976); section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1983); and certain provisions of Pennsylvania law. The complaint seeks a declaration that the policies, practices and procedures of the defendants are unconstitutional and violated federal and state statutes; a permanent injunction prohibiting defendants from enforcing those policies, practices and procedures; reinstatement of Strathie's school bus driver's license at a seniority status as if his license has never been suspended; compensatory damages including back pay; and attorney's fees.

On May 12, 1979, the district court ordered that the action be maintained as a class action, and certified a class consisting of all persons who have had their Class 4 school bus driver's licenses suspended pursuant to the alleged discriminatory regulations of the defendants.

Subsequently, based on video-tape testimony, depositions and other exhibits, the district court entered judgment for defendants on all of plaintiffs' claims.[2] Strathie's appeal challenges the district court's dismissal of his individual claims under the Rehabilitation Act[3] and the Fourteenth Amendment.[3a] We will not address Strathie's appeal with regard to the Fourteenth Amendment because he relies on a legal theory that was not presented to the district court. However, we reject appellees' contention that the Rehabilitation Act claim was not raised below.

### II.

In enacting and amending section 504 of the Rehabilitation Act, Congress "made a commitment to the handicapped, that, to the maximum extent possible they shall be fully integrated into the mainstream of life in America." S.Rep. No. 890, 95th Cong., 2d Sess. 39 (1978). Section 504 provides, in pertinent part, that:

> No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794. Section 504 creates a private right of action in favor of persons who allege to have been subjected to illegal discrimination based on handicap. *NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1258 (3d Cir.1979).[4]

---

**2.** In their answer to the complaint in the district court, defendants asserted as an affirmative defense that "The court should abstain from hearing plaintiff's case." However, we cannot find where that defense was ever pressed. Indeed, it does not appear in defendants' pre-trial statement. We know that our court was not asked to affirm on abstention grounds. Thus, the status of that defense, if properly assertable after remand, will be for the district court to decide.

**3.** Strathie also argues on appeal that the appellees violated his civil rights under certain feder-

al regulations implementing section 504 of the Rehabilitation Act. Hereinafter, when we refer to Strathie's claim under section 504, we will include *sub silentio* his claim under the regulations.

**3a.** Whether Strathie's decision not to appeal on behalf of the class violated any of his fiduciary duties as class representative is a matter the district court may want to pursue on remand.

**4.** Whether section 504 creates a private right of action for damages or merely for injunctive and declaratory relief is a different question, which

In order to make out a case under section 504 of the Rehabilitation Act, a plaintiff must prove (1) that he is a "handicapped individual" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position sought solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance. *See Doe v. New York University,* 666 F.2d 761, 774 (2d Cir.1981).

It is undisputed that Strathie is a handicapped person, and that his license was suspended solely by reason of his handicap. With regard to federal funding, the parties have stipulated that both the Pennsylvania Department of Transportation and the Department of Education receive federal financial assistance. Thus, the school bus driver licensing program qualifies as a recipient of federal funds for purposes of section 504, regardless of whether any of the federal funding in question is earmarked for that program. *Le Strange v. Consolidated Rail Co.,* 687 F.2d 767 (3d Cir. 1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983). *See also Grove City College v. Bell,* 687 F.2d 684 (3d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983) (Title IX case).

Thus, the principal issue presented in this appeal is whether Strathie is "otherwise qualified" to be a school bus driver. Strathie bears the ultimate burden of proof as to this issue. *See Doe v. New York University,* 666 F.2d at 776–77; *NAACP v. Wilmington Medical Center,* 657 F.2d 1322, 1332 (3d Cir.1981).[5]

### A.

In *Southwestern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the United States Supreme Court held that an "otherwise qualified" handicapped individual is one who can meet all of a program's requirements in spite of his handicap. *Id.* at 406, 99 S.Ct. at 2367. In dictum, however, the Court indicated that an individual may be "otherwise qualified" in some instances even though he cannot meet all of a program's requirements. This is the case when the refusal to modify an existing program to accommodate the handicapped individual would be unreasonable, and thereby discriminatory. *Id.* at 412–13, 99 S.Ct. at 2370; *Prewitt v. United States Postal Service,* 662 F.2d at 305 (referring to such a refusal to accommodate a handicapped individual as "surmountable barrier discrimination"). *See Simon v. St. Louis County,* 656 F.2d 316 (8th Cir.1981), *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir.1980).

In *Davis,* the Supreme Court indicated that two factors pertain to the reasonableness of a refusal to accommodate a handicapped individual. First, requiring accommodation is unreasonable if it would necessitate modification of the essential nature of the program. *See Southwestern Community College v. Davis,* 442 U.S. at 410, 413, 99 S.Ct. at 2369, 2370 (section 504 does not require fundamental, major or substantial program modifications); 29 C.F.R. § 1613.705 (1983) (Department of Health, Education and Welfare regulations implementing section 504) (selection criteria which screen out handicapped individuals must pertain to essential functions of the program in question). Second, requiring accommodation is unreasonable if it would place undue burdens, such as extensive costs, on the recipient of federal funds. *Davis,* 442 U.S. at 412, 99 S.Ct. at 2370; *Nelson v. Thornburgh,* at 379–382.

---

we do not confront here. *See Nelson v. Thornburgh,* 567 F.Supp. 369 at 382–383 (E.D.Pa. 1983) (section 504 creates private right of action for damages).

**5.** Given the present posture of this case, we need not consider whether a section 504 plaintiff or defendant may have any preliminary burdens of persuasion or production similar to

those existing under Title VII. *See United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). *See generally, Doe v. New York University,* 666 F. 2d at 776; *Prewitt v. United States Postal Service,* 662 F.2d 292, 307–10 (5th Cir.1981); *Bey v. Bolger,* 540 F.Supp. 910, 924–25 (E.D.Pa. 1982).

Notably absent from the Supreme Court's opinion in *Davis,* however, is any discussion of the scope of judicial review with regard to the reasonableness of a refusal to accommodate a handicapped individual. Program administrators surely are entitled to some measure of judicial deference in this matter, by reason of their experience with and knowledge of the program in question. *See Doe v. New York University,* 666 F.2d at 775–76. On the other hand, broad judicial deference resembling that associated with the "rational basis" test[6] would substantially undermine Congress' intent in enacting section 504 that stereotypes or generalizations not deny handicapped individuals equal access to federally-funded programs. *See Southwestern Community College v. Davis,* 442 U.S. at 405, 99 S.Ct. at 2366 (mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context); Note, *Accommodating the Handicapped: Rehabilitating Section 504 After Southeastern,* 80 Colum.L.Rev. 171, 175 (1980) (legislative history of section 504 indicates that Congress intended to bar the use of stigmatizing stereotypes and generalizations with regard to handicapped persons).

■ We believe the following standard effectively reconciles these competing considerations: A handicapped individual who cannot meet all of a program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds. *See* Gisler, *Fair Employment and the Handicapped: A Legal Perspective,* 27 DePaul L.Rev. 953, 980–81

**6.** *See Allied Stores v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 442, 3 L.Ed.2d 480 (1958) (any conceivable basis is sufficient to justify constitutionality of legislative classification); *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (constitution permits legislative reform to proceed one step at a time).

**7.** Implicit in the modifications proposed by Strathie in rebuttal to the Department's safety

(1978); *cf. Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228, 235 (5th Cir.1969) (applying factual basis standard in sex discrimination case). We note that the United States Court of Appeals for the Second Circuit has applied this standard, without designating it as such, in a context substantially similar to the case at hand. In *New York State Association for Retarded Children v. Carey,* 612 F.2d 644 (2d Cir.1979), the Second Circuit held that section 504 prevented a city board of education from excluding from its regular classrooms mentally retarded children who were thought to be carriers of hepatitis, when the board was unable to demonstrate that the health hazard posed by the children was anything more than a remote possibility. *Id.* at 650.

In the present case, it is undisputed that Strathie cannot meet all the requirements necessary to obtain a school bus driver's license because he wears a hearing aid. Strathie contends that he is otherwise qualified to obtain this type of license because the Department of Transportation's refusal to accommodate him is unreasonable. The Department's response is that, for several reasons, no hearing aid wearer can be issued a school bus driver's license without jeopardizing the essential purpose of the school bus driver licensing program.[7]

**B.**

■ The first step in resolving this dispute must be to ascertain the essential nature of the school bus driver licensing program. The district court held that the essence of the licensing program is to ensure that school bus drivers are able to provide control over and safety to school bus passengers. The Department contends, how-

concerns is that the Department will have to conduct, at least in some cases, individualized examinations of hearing aid wearers who apply for a school bus driver's license. The Department does not argue in this appeal that such individualized examinations, or any of the program modifications suggested by Strathie, would place an undue burden on the Department. *See Southeastern Community College v. Davis,* 442 U.S. at 412, 99 S.Ct. at 2370.

ever, that the purpose of the licensing program is not only to provide for the safety of school bus passengers, but to ensure the highest level of safety. The Department views its responsibility under the program as requiring it to eliminate as many potential safety risks as it can.

Although we fully appreciate the Department's concern for the safety and discipline of school bus passengers, we believe the Department's characterization of the essential nature of its licensing program is overbroad. In our view, the essential nature of the program is to prevent any and all *appreciable* risks that a school bus driver will be unable to provide for the control over and safety of his passengers.[8] *See New York States Association for Retarded Children v. Carey,* 612 F.2d at 650; *cf. Doe v. New York University,* 666 F.2d at 777. For example, we note that the Department allows the granting of school bus driver's licenses to individuals who must wear eyeglasses in order to meet Department vision standards. 67 Pa.Code § 71.-3(b)(1)(i); app. 235 (Rader deposition). If such a person's eyeglasses were to be removed, either voluntarily or involuntarily, while he was driving a school bus, he would certainly present a danger to the safety of his passengers. That such an individual is allowed to obtain a school bus driver's license indicates that the Department views some safety risks as too remote to justify the denial of a school bus driver's license.

Department of Transportation Regulations concerning other physical disabilities confirm our description of the essential purpose of the school bus driver licensing program. For example, several physical ailments will prevent an individual from obtaining such a license only if the ailment is "*likely* to interfere with the ability to drive a school bus with safety." 67 Pa.Code § 71.3(b). These ailments include (1) color blindness, (2) respiratory disfunctions, (3) rheumatic, arthritic, orthopedic, muscular or neuromuscular disease, and (4) mental,

nervous, organic or functional diseases. *Id.* Similarly, the Department's regulations authorize the Medical Advisory Board to waive the requirement that a school bus driver applicant have no loss or impairment of the use of any foot, leg, arm, hand, fingers or thumb "upon determining that the impairment will not interfere with the ability of the driver to drive a school bus with safety." 67 Pa.Code § 71.3(b)(2).

Having thus identified the essential nature of the Department's licensing program, we are prepared to address the Department's several reasons why an accommodation of hearing aid wearers would be inconsistent with this purpose. First, the Department points out that hearing aids can become dislodged. Therefore, the Department argues that even if an individual could meet the minimum hearing level standards prescribed in 67 Pa.Code § 71.3(b)(5) with the use of a hearing aid, there is an appreciable danger that he may lose the hearing aid and thus be unable to provide for the safety and control of his passengers.

Strathie responds by suggesting that the Department could require hearing-impaired school bus drivers to wear an eyeglass type of hearing aid, such as he wears. This type of hearing aid is built into the temples of a person's eyeglasses, and is fitted tightly against the bone over the ear. There is record evidence, in the form of depositions from experts Leidy and Jewell, that this type of hearing aid is less likely to become dislodged than are regular eyeglasses. App. 163, 213. Based on this evidence, and the fact that the Department allows eyeglass wearers to obtain school bus driver's licenses, Strathie argues that a school bus driver who wears this type of hearing aid is not so likely to have it dislodged that he poses an appreciable risk to the safety of his passengers.

The district court accepted the Department's reliance on the risk of hearing aid dislodgement without addressing Strathie's proposed modification. Given the consider-

---

**8.** When read in context, 23 C.F.R. § 1204, Subpart B, No. 17 (1983), which prescribes uniform federal standards for pupil transportation safe-ty, is not inconsistent with our characterization of the essential purpose of the school bus driver licensing program.

ations noted above, we cannot say at this stage that a reasonable fact finder would have no alternative but to find a factual basis in the record reasonably demonstrating that Strathie's proposal would require a modification of the essential purpose of the licensing program. Thus, we cannot affirm the district court on the basis of risk of dislodgement.

Second, the Department of Transportation points out that a hearing aid, like any other active mechanical device, is subject to sudden mechanical failure. This might occur, for example, if a hearing aid battery were to wear out. The Department argues that there is an appreciable risk that the mechanical failure of a hearing aid may endanger the wearer's ability to provide for the control and safety of school bus passengers.

Strathie rejoins that the Department could eliminate all appreciable risk of mechanical failure by requiring a periodic inspection of hearing aids. Similarly, Strathie says the Department could require each user to purchase an inexpensive battery tester, app. 157–58 (Jewell deposition), and to check the power and operability of his hearing aid before each school bus trip.

Strathie also contends that the Department could adopt regulations which would eliminate any appreciable risk that, even were a hearing aid to fail suddenly, the user would lose control over his passengers or endanger their safety. For example, Strathie says the Department could require hearing aid wearers to carry a spare aid and extra batteries. If a hearing aid were to fail suddenly, Strathie argues, neither the process of replacing the aid or its batteries, nor the time spent in so doing would jeopardize the driver's ability to provide for the control over and safety of his passengers to an appreciable extent.

The district court accepted the Department's reliance on the mechanical failure argument without addressing any of the possible modifications suggested by Strathie. We cannot at this stage say that a reasonable fact finder would have no choice but to find these modifications unreason-

able, under the standard we have set forth. Therefore, we cannot affirm the district court on this ground.

Third, the Department argues that hearing aid wearers cannot be accommodated into the school bus driver licensing program because those individuals may turn the volume of their hearing aids down or off. The Department relies on the depositions of experts who say that in noisy situations, such as on a school bus, hearing aid wearers have an incentive to reduce the volume of their aids. Strathie responds that the Department could require hearing aid wearers to purchase and use a hearing aid with a pre-set volume that cannot be routinely altered. See App. 160 (Jewell deposition); App. 207 (Leidy deposition).

The district court accepted the Department's hearing aid turn-off argument, based on expert testimony that there is no way to test whether a school bus driver will turn off his hearing aid. Obviously, this argument does not pertain to Strathie's proposal that hearing aid wearers be required to use aids the volume of which can be pre-set. The district court did not comment on this proposed modification. Given the existence of the Jewell and Leidy depositions in the record, we cannot say at this stage that a reasonable fact finder would have to conclude that Strathie's proposed modification would not alleviate any and all appreciable risks that hearing impaired school bus drivers would turn off their hearing aids. Therefore, we cannot affirm the district court on this ground.

Finally, the Department contends that the inability of hearing aid wearers to localize sound may render them unable to provide for the safety and control of their passengers in certain situations. In response, Strathie proposes that the Department could require hearing aid wearers to purchase and use a stereo hearing aid, similar to the type that he uses. There is expert testimony in the record that, at least for some hearing impaired individuals, a stereo hearing aid totally cures the problem of sound localization. App. 120–21 (Cole deposition); App. 203 (Leidy deposition).

Moreover, there is expert testimony that audiological testing can identify which hearing-impaired individuals can localize sound with the use of stereo hearing aids, and which cannot. App. 115 (Cole deposition); App. 188 (Leidy deposition).

The district court held that accommodating wearers of stereo hearing aids within the school bus driver licensing program would require a modification of the essential purpose of the program, for two reasons. First, the court said that stereo hearing aid wearers would not be able to localize sound if the volume control for one side were set higher than for the other. In our view, this objection is no different than the Department's "turn-off" argument. Therefore, we cannot rely on this aspect of the court's holding as grounds for affirmance.

Second, the district court said that "[a]lthough [a stereo] type of hearing aid undoubtedly enables the wearer to localize sound better than other types, the wearer still may not be able to distinguish the direction from which sound comes as well as a person with normal hearing." This statement is ambiguous. On the one hand, the statement may mean that although some wearers could localize sound with the use of stereo hearing aids as well as a person with normal hearing, others could not. We are not free to affirm on this ground, because the district court failed to address Strathie's contention that mandatory audiological testing would reveal which stereo hearing aid wearers would be able to localize sound sufficiently well, and which would not.

On the other hand, the district court could have meant to say that no wearer of stereo hearing aids can localize sound as well as a normal person. We have three difficulties with this conclusion. First, we are not convinced that the deposition of Dr. Cole supports the district court's conclusion. Although Dr. Cole's deposition says that stereo hearing aids do not "always compensate" with regard to sound localization, Dr. Cole does not state whether a stereo hearing aid compensates fully for some hearing-impaired individuals but not for others, or whether that type of hearing aid does not fully compensate any hearing-impaired indi-

vidual's sound localization difficulties. App. 117–18.

Second, even if Dr. Cole's deposition could be read to say that a stereo hearing aid does not fully cure the sound localization difficulties of any hearing aid wearer, there is testimony from expert Leidy which is clearly to the contrary. App. 203. Because the district court's opinion does not refer to the Leidy deposition, we cannot be certain that the court took this evidence into account in evaluating the sound localization question.

Finally, we are not at all satisfied that the proper question with regard to sound localization is whether an individual wearer of stereo hearing aids can localize sound as well as a normal person. Instead, we believe the correct statement of the issue is whether there is a factual basis in the record reasonably demonstrating that accommodating a wearer of a stereo hearing aid would present an appreciable risk to the safety and control of school bus passengers if permitted to drive school buses. Therefore, for all of the above reasons, we cannot accept the Department's sound localization argument as grounds for affirmance.

### III.

We will vacate the district court's judgment and remand for further proceedings.