Ralph SHARON, et al.

v.

Dr. Thomas LARSON, et al.

Civ. A. No. 80–1664.

United States District Court,
E.D. Pennsylvania.

Dec. 30, 1986.

Alfred W. Putnam, Jr., Drinker, Biddle & Reath, Alfred W. Putnam, Jr., Philadelphia, Pa., for plaintiffs.

Carl Vaccaro, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

This is a class action challenging a Pennsylvania Department of Transportation regulation that prohibits the use of bioptic lenses [1] to satisfy the minimum visual acuity standard for obtaining a driving license. Plaintiffs claim that the challenged regulation discriminates against the handicapped, in violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and denies class members their fourteenth amendment rights to equal protection and due process. After a non-jury trial and extensive submissions, I have made the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Pursuant to authority granted by the Pennsylvania Vehicle Code ("Code"), the Pennsylvania Department of Transportation ("Department") adopted certain physical and mental standards that govern the licensing of drivers in Pennsylvania. These standards appear at 67 Pa. Code § 83.1–83.5 (1986).

2. These standards were formulated by the Department's Medical Advisory Board, which is composed of thirteen members, including at least eight medical professionals and one ophthalmologist and one optometrist. 75 Pa. Cons.Stat.Ann. § 1517 (Purdon 1977 & Supp.1986)

3. Visual acuity, as used in this case, is measured by means of a conventional eye-chart. The applicant is asked to identify letters on a chart located twenty feet away from him. If the applicant can read all the letters on a designated line that a normally sighted person could be expected to read at a distance of twenty feet, he is said to have "20/20" or normal vision. If, at a distance of twenty feet, the applicant is unable to identify the letters on the line designated 20/20, but can identify the larger letters on the 20/40 line, he is said to have 20/40 vision. The 20/40 line is so named because persons with normal 20/20 vision would be expected to be able to identify the letters on that line at a distance of forty feet. Similarly, individuals with 20/60, 20/70 and 20/100 vision must be within twenty feet to identify letters of a size that normally sighted individuals would be expected to identify at sixty, seventy, and one hundred feet respectively.

4. The relevant minimum vision standards for Pennsylvania drivers are as follows:

Section 83.3. Visual Standards.

(a) Driving without corrective lenses. A person with visual acuity of 20/40 or better combined vision may drive without corrective lenses, but if that person has less visual acuity than 20/40 in one eye, that eye shall be corrected to its best visual acuity.

(b) Driving with corrective lenses. A person with less visual acuity than 20/40 combined vision shall wear lenses correcting his vision to 20/40 or better while

---

1. Also described in the alternative as "telescopic lenses."

driving except that if correction to 20/40 is not possible, the person may drive in daylight hours only if one of the following are met:

    (1) The combined vision has been corrected to 20/60 or better.

    (2) Visual acuity is less than 20/60 combined vision but at least 20/70 combined vision with best correction, but only upon recommendation of a licensed optometrist or licensed physician who has equipment to properly evaluate visual acuity.

(c) Visual acuity of less than 20/70. A person with visual acuity of less than 20/70 combined vision with best correction is not authorized to drive....

(e) Sight in one eye. A person may be adequately sighted in only one eye and still meet the requirements of this section; however, the person's driving privilege will be restricted to vehicles having mirrors so located as to reflect to the person a view of the highway for a distance of at least 200 feet to the rear.

(f) Telescopic lenses. Correction through the use of telescopic lenses shall not be acceptable for purposes of meeting acuity requirements.

67 Pa.Code § 83.3 (1986).

5. Plaintiff Ralph Sharon is a citizen of Pennsylvania who suffers from low vision and who wishes to obtain a driver's license.

6. In January 1979, Sharon applied for a learner's permit in Pennsylvania. On February 27, 1979 that application was denied because he could not meet the Department's vision standards. The denial was confirmed by the Medical Advisory Board on June 19, 1979.

7. According to the stipulated 1981 statement of Dr. Randall Jose, Sharon's visual acuity with the right eye was 20/120 and with the left eye was 20/300 using conventional corrective lenses. Sharon's best combined visual acuity using conventional lenses was 20/100, which does not meet Department standards. Sharon's visual acuity has been measured at slightly better than 20/20 in his right eye when using a telescopic lens.

8. A bioptic lens consists of a miniature telescope mounted upon conventional corrective lenses. The telescope provides a magnified central field of between eight and twenty-two degrees. Images within this field appear larger and are therefore easier to resolve.

9. Sharon represents a class of all those similarly situated: to wit, all those who cannot meet Pennsylvania's acuity requirements without using bioptic lenses but who can meet that standard if permitted to use such lenses.

10. The use of bioptic lenses for the operation of motor vehicles is prohibited in many states. States that permit the use of bioptic lenses to meet acuity requirements and which have licensed drivers who wear such lenses include California, New York, Michigan and Massachusetts.

11. The parties have stipulated into evidence several studies on the safety of low vision and bioptic drivers. The studies include:

(a) The Burg studies. Dr. Albert Burg, of the Institute of Transportation and Traffic Engineering, University of California, Los Angeles, CA, compiled information on vision test performance, personal and driving habits and driving records for 17,769 California drivers. The study traced over 14,000 drivers for a three year period, and nearly 8,000 drivers for a six year period. Burg found "substantial, but not conclusive, evidence that static [visual] acuity ... [is] related to driving record...." Burg, Vision and Driving: A Report on Research, 13 Human Factors 79, 86 (1971).

(b) The California study. A 1983 report prepared for the California Department of Motor Vehicles found that telescopic lens users had an accident rate of 12.10% as compared to an accident rate of 7.96% for the general driving population. In this study, the rate was adjusted to reflect the fact that drivers with telescopic lenses are typically male and younger than the general driving population. The difference in accident rates amounted to approximately 1.5 times as many accidents for the telescopic lens users.

A 1978 California Department of Motor Vehicles study revealed that the accident rates of drivers with medical conditions other than impaired vision (uncorrected for age and sex) ranged from 2.3 to 4.8 times the general population rate, depending on the type of condition.

(c) The New York study. In 1978, the New York Department of Motor Vehicles conducted a study of 68 bioptic drivers. On an annual basis, bioptic drivers had an 11% accident rate as opposed to an approximately 6% rate for the general driving population.

(d) The Massachusetts studies. A 1970 study by Dr. Donald Korb revealed that bioptic drivers in Massachusetts had a significantly lower accident rate than the general driving population. However, this study did not account for the number of miles driven by bioptic drivers. Plaintiff's witness Dr. Kelleher testified about a Massachusetts study which found accident rates similar to those found by the New York study.

(e) The Maine study. In February, 1983, Maine's Motor Vehicle Division released a study of the safety record over a seven year period (1976–1982) of fourteen of that state's sixteen bioptic drivers. The accident rate per mile driven was higher than that of the general population by a factor of 1.8. However, the report's conclusion states that "[t]he sample in this study makes any meaningful statistical study impossible."

Moreover, Maine has instituted a driving and monitoring program for bioptic drivers and has reported that these drivers have a "superior" driving accident rate.[2]

12. Pennsylvania permits monocular (one-eyed) persons to apply for and obtain driving lenses. 67 Pa.Code § 83.3(e) (1986). Defendant's expert concedes that studies indicate that monocular drivers have accident rates approximately one and one-half to two or three times greater than the general population.

13. Static visual acuity refers to the ability to perceive details of a stationary object. The conventional eye chart test described above in Finding No. 3 tests an applicant's static visual acuity within his central field of vision. It does not test dynamic visual acuity, or the ability to perceive details of an object when there is relative motion between the observer and the object. Further, it does not measure an applicant's peripheral vision.

14. The peripheral vision of individuals with low central field static visual acuity is generally the same as the peripheral vision of a normally sighted person.

15. The majority of driving time involves peripheral vision rather than central field visual acuity.

16. Bioptic drivers use telescopic lenses to read road signs and to spot and identify objects. Testimony by bioptic drivers suggests that the lens is used significantly less than 5% of the total driving time. Thus, for the great percentage of driving time, bioptic drivers are looking through their conventional lenses.

17. Defendant's expert testimony, which I find credible, established that vision obtained through bioptic lenses is not equivalent to vision obtained without corrective lenses. In addition, the telescopic lenses themselves interfere with a user's field of vision. Visual impairments associated with telescopic lenses include the following:

(a) Surrounding the small magnified visual field seen through the telescope lens is a "ring scotoma," or blind spot formed by the casing of the lens itself. This blind spot may be two or three times larger than the visual field created by the lens. The donut shaped scotoma may obstruct the view of large objects,

---

**2.** An August 1984 Motor Vehicle Division memorandum, drafted by the author of the 1983 study, stated in relevant part:

After the standards were developed some of our more flagrant drivers voluntarily surrendered their driving privilege based on their past performance and the new group that we have in our population represents a much younger, highly-motivated and highly-educated group than our average Maine driver. This group has done a superior job during the past two years with one accident.

including people, at distances of ten or more feet. At a distance of 200 feet, the scotoma may obstruct an object as large as a truck or a house. In addition, the ring scotoma causes optical illusions as objects seem to appear from and disappear into the blind spot. The sensation experienced by a bioptic user when objects pass from the unmagnified field of vision into the blind spot and then into the visual field of the bioptic lens is known as the "Jack-in-the-Box" effect.

(b) Objects viewed through the telescopic lens appear much closer than they actually are, a phenomenon known as nearness of vision. An object magnified six times would appear to be one-sixth as far away as it actually is.

(c) The placement of the telescopes on the eyeglass lens creates an "awning" effect which partially obscures the overhead view. This awning effect may block the views of overhead traffic control signs and signals.

(d) The images seen through the telescope move rapidly in the opposite direction of any head movement. The speed of movement in the opposite direction increases as the magnification power of the telescopes increases.

18. Other states have adopted special regulations and training programs for bioptic drivers. For example, Massachusetts and California require certain information from the applicant's eye doctor. In some states, bioptic drivers obtain a restricted license. In California, for example, bioptic drivers cannot obtain licenses to operate certain commercial vehicles.

19. Plaintiff's experts testified that not all bioptic lens users are equally equipped to drive. In general, those with degenerative, as contrasted with stable, conditions, and those who have used the lens for a relatively short period of time are thought to pose greater safety risks.

20. Dr. Dennis Kelleher, whom I find to be a credible witness, testified that he has driven with a telescopic lens since March 1971. He drives approximately 25,000 miles per year and stated that he is not troubled by the optical limitations mentioned above.

21. The Pennsylvania Department of Transportation receives funds from the United States Department of Transportation which are used in the construction, repair and maintenance of Commonwealth roads and highways.

22. The Medical Advisory Board to the Pennsylvania Department of Transportation is funded in part by financial assistance received from the United States Department of Transportation.

23. The Pennsylvania Department of Transportation received federal financial assistance from the United States Department of Transportation in preparing and revising the current Motor Vehicle Code and Regulations, including laws and regulations pertaining to the standards governing qualifications for motor vehicle operating privileges.

## DISCUSSION

### I.

■ Section 504 of the Rehabilitation Act, provides in relevant part, that

[n]o otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance....

29 U.S.C. § 794. This section provides a private right of action in favor of persons who allege that they were subjected to illegal discrimination based on handicap. *NAACP v. Medical Center, Inc.*, 599 F.2d 1247, 1259 (3d Cir.1979).

■ To prevail in a § 504 case, a plaintiff must prove that (1) he is "handicapped" for purposes of the Rehabilitation Act; (2) he is "otherwise qualified" for the program[3]; (3) he was excluded from the program solely by reason of his handicap; and (4) the program in question receives federal financial assistance. *Strathie v. Depart-*

---

3. The "program" being the Department's driver licensing program.

*ment of Transportation,* 716 F.2d 227, 230 (3d Cir.1983).

█ It is not disputed that Sharon is handicapped, or that the Pennsylvania Department of Transportation receives federal financial assistance. The principal issue is whether Sharon is an "otherwise qualified" motor vehicle driver. Sharon bears the ultimate burden of proof on this issue. *Id.*

## II.

The legislative history of the Rehabilitation Act does not reveal the Congressional intent in choosing the phrase "otherwise qualified." However, this term has been closely examined by the Supreme Court in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and then, in this circuit, in *Strathie.* In *Davis,* the Supreme Court held that an "otherwise qualified" handicapped individual is one who can meet all of a program's requirements in spite of his handicap. *Southeastern Community College v. Davis, supra,* 442 U.S. at 406, 99 S.Ct. at 2367. In dictum, the Court suggested that an individual may be "otherwise qualified" even though he cannot meet all of a program's requirements. This is the case when the refusal to modify a program to accommodate the handicapped individual is unreasonable, and therefore discriminatory. *Id.* at 412–13, 99 S.Ct. at 2370. *Davis* suggested that requiring accommodation is unreasonable if it necessitates modification of the essential nature of the program, or if it places undue burdens on the recipient of federal funds. In *Strathie,* this circuit adopted these suggestions and set out the following legal test:

> A handicapped individual who cannot meet all of a program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds.

*Strathie v. Department of Transportation, supra,* 716 F.2d at 231.

## III.

Plaintiff argues that with "reasonable accommodations" he is "otherwise qualified" to operate a motor vehicle. He contends that the accommodations he proposes—permission to use bioptic lenses during the eye examination, and individualized testing and training of bioptic drivers— would neither modify the essential nature of the State's licensing program, nor impose an undue financial burden on the State.

Plaintiff's claim that he is "otherwise qualified" rests on three distinct propositions: (1) with bioptic lenses, he can meet the State's visual acuity requirements; (2) the use of bioptic lenses is not incompatible with driving safety; and (3) with proper screening and training, bioptic drivers are not unsafe and may be safer than other groups the State licenses to drive.

As plaintiff relies heavily on *Strathie,* it is appropriate that my analysis begin with a review of that case. Strathie was a school bus driver. His license was suspended because he wore a hearing aid. A Department regulation, presently codified at 67 Pa.Code § 71.3(b)(12) (1986), required that school bus drivers possess a certain hearing capacity, "without a hearing aid." Strathie could meet this capacity with a hearing aid, but could not meet it without a hearing aid. Strathie challenged the regulations under § 504 of the Rehabilitation Act and the fourteenth amendment.

The Department advanced several reasons why it believed that hearing aids were inconsistent with the essential nature of its licensing program. The Department argued that a hearing aid could become dislodged, thereby impairing the driver's ability to provide for the safety of his passengers. Strathie proposed that the State require a particular type of hearing aid which rarely becomes dislodged. The Department next argued that hearing aids are subject to sudden mechanical failure. This could occur, for example, if a hearing aid battery were to wear out. Strathie proposed that the State require school bus drivers to carry extra batteries, or a spare

hearing aid. The Department argued that drivers may turn the volume of their hearing aids down or off; Strathie suggested that the Department require use of hearing aids with pre-set volume controls. Finally, the Department claimed that hearing aid wearers are unable to "localize" sound, and Strathie proposed that the Department require drivers to wear stereo hearing aids.

The district court granted judgment in favor of the defendants. However, the district court failed to address any of Strathie's proposed modifications. As there was no "factual basis in the record reasonably demonstrating that accommodating [plaintiff] would require either a modification of the essential nature of the program, or impose an undue burden" on the defendants, *id.* at 231, the case was remanded for a determination of whether there were facts reasonably demonstrating that plaintiff's proposed modifications were unreasonable.

Close examination reveals that Sharon's proposed "modifications" are fundamentally different from those proposed in *Strathie.* In that case, plaintiff addressed each potential problem hearing aids presented on its own terms. For example, when the Department claimed that hearing aids could become dislodged, or suffer battery failure, Strathie suggested the use of a special hearing aid that is not easily dislodged, and the carrying of a spare set of batteries.

In this case, the accommodation itself, *i.e.,* the bioptic lenses, carries its own built-in danger, the creation of a large and dangerous blind spot resulting from the structure of the lenses. Sharon does not propose the use of a lens which would eliminate or even minimize this blind spot. Rather, he simply asserts that, for experienced bioptic lens users, this blind spot does not present an impediment to safe driving. Similarly, in answer to the Department's claim that bioptic lenses create an "awning" effect, which I have found as a fact to be so, Sharon does not propose the use of lenses which would eliminate this effect. Rather, he simply asserts that the awning effect does not create a significant threat to driving safety.

These examples illustrate that, with respect to the vision impairments caused by bioptic lenses, Sharon is not proposing "reasonable accommodations." Instead, he is asking the court to reject the Commonwealth's considered legislative determination that the use of bioptics is incompatible with driving safety. The evidence before me demonstrates that the blind spots produced by the bioptic lenses themselves may adversely affect a bioptic lens wearer's ability to drive safely. On this record the Commonwealth has reasonably demonstrated that the use of bioptic lenses is incompatible with the essential nature [4] of its driver licensing program. When the accommodation itself renders the potential driver unsafe to drive, it is not reasonable to compel the State to allow this accommodation.

Moreover, the evidence demonstrates that even with individualized testing and screening programs, bioptic drivers would pose appreciable safety risks to themselves and other Commonwealth drivers. To be sure, evaluating the safety risks posed by bioptic drivers is not easy. As plaintiff concedes, "[e]mpirical data on the accident rate of drivers using telescopic lenses is not abundant." Plaintiff's trial memoran-

---

**4.** Neither party has briefed the issue of "the essential nature" of the State's licensing program. The Department of Transportation is directed to "establish by regulation the qualifications necessary for the safe operation of ... [motor] vehicles." 75 Pa.Cons.Stat.Ann. § 1504 (Purdon 1977 & Supp.1986). Handicapped persons whose conditions "are likely to interfere with the ability to control and safely operate a motor vehicle" are prohibited from driving. 67 Pa.Code § 83.5 (1986). The licensing program is designed, obviously, to promote highway safety, and is, in this respect, analogous to the safety regulations challenged in *Strathie.* The court found that "the essential nature of the [licensing] program is to prevent any and all *appreciable* risks that a school bus driver will be unable to provide for the ... safety of his passengers." *Strathie v. Department of Transportation, supra,* 716 F.2d at 232 (emphasis in original). Following *Strathie* I find that the essential nature of the State's physical and mental criteria relating to the licensing of drivers is to prevent any and all appreciable safety risks drivers pose to themselves and others by virtue of physical or mental handicaps.

dum at 13. However, the studies covered by Finding of Fact No. 11, while not conclusive, strongly suggest that bioptic drivers in Pennsylvania would have a significantly higher accident rate than that of the present driving population and thereby pose appreciable safety risks to themselves and other Pennsylvania drivers.[5]

Plaintiff points out that bioptic drivers have lower accident rates than, *inter alios,* monocular and epileptic drivers whom the Department permits to drive with accommodation. From this, plaintiff argues that the State unlawfully discriminates among different classes of handicapped persons.

Under Pennsylvania law, monocular drivers *are permitted to operate only specially equipped vehicles.* 67 Pa.Code § 83.3(e) (1986). An epileptic may drive only if a licensed physician certifies that his condition falls within one of several clearly defined categories. 67 Pa.Code § 83.4 (1986). Persons suffering from certain other mental and physical impairments may not drive if, in the opinion of the treating physician, the impairment is likely to interfere with his or her ability, "to control and safely operate a motor vehicle." 67 Pa.Code § 83.5 (1986).

The potential safety problems posed by these classes of handicapped persons arise out of their physical or mental impairments. The potential safety problems faced by bioptic lens users arise out of their poor vision *and* from visual impairments caused by the actual lenses themselves. Thus, although the State can attempt to accommodate for the problems posed by the actual impairment—poor eyesight—by allowing people to wear corrective lenses, there is no suggestion of how to accommodate for the impairments caused by the bioptic lenses. The bioptic lens, over and above any vision problem, is likely to interfere with the ability to control and safely operate a motor vehicle. There is thus a reasonable basis for the differ-

ence in treatment and hence no unlawful discrimination.

For the above reasons, plaintiff has failed to establish that he is "otherwise qualified" to operate a motor vehicle. I am not unsympathetic to the fact that the physically disabled are often discriminated against on the basis of stereotypes and overbroad generalizations. However, the safety problems cited by the Commonwealth are neither hypothetical nor pretextual.

The parties stipulated as evidence the exhibits contained in a collection designated as "Joint Record-Volume III." These exhibits support my determination. They show that the American Medical Association, the American Committee on Optics and Visual Physiology and the American Association of Motor Vehicle Administrators all oppose the use of bioptic lenses for the operation of motor vehicles. A 1976 conference sponsored by the American Medical Association and the American Association of Motor Vehicle Administrators recommended that "[n]o individual should be licensed to drive unless able to meet the state's legal requirements for visual acuity without the aid of a telescopic device." Finally, a 1982 position paper prepared for the United States National Highway Traffic Safety Administration concluded that persons "should not be licensed if the [bioptic lens] is needed to raise the applicant's vision to that lawful standard established by the States for users of regular eyeglasses." The State's regulation does not unlawfully discriminate against bioptic lens users in violation of the Rehabilitation Act.

A contrary finding would effectively undermine Pennsylvania's ability to enforce visual acuity standards in it's licensing program. Bioptic drivers look through the telescopic lens less than 5% of the time they are driving. The rest of the time, they look through conventional eyeglass

---

**5.** The figures in these studies highlight another significant difference between this case and *Strathie.* In *Strathie,* studies of drivers in Pennsylvania, Colorado, Oregon, Wisconsin and Washington, D.C. all reached the conclusion that hearing impaired drivers had only one-

fourth to one-third as many accidents proportionately as drivers with unimpaired hearing. A nationwide survey reached the same conclusion. *Strathie v. Department of Transportation,* 547 F.Supp. 1367, 1375 (E.D.Pa.1982).

lenses. Mandating accommodations for plaintiff's class could lead to the following anomalous result: Persons with eyesight of, for example, 20/80 or 20/90 with regular glasses, cannot pass the vision examination and are denied the opportunity to operate motor vehicles. However, a person with eyesight of, for example, 20/200 with glasses, who wears bioptics can pass the vision examination. This person might obtain driving privileges, notwithstanding the fact that over 95% of the time he drives he will be using his 20/200 vision. Surely, the Rehabilitation Act does not require such an incongruous result.

## IV.

■ Plaintiff also claims that the regulation under challenge violates the due process and equal protection clauses of the fourteenth amendment to the United States Constitution. As the handicapped do not form a suspect class, and driving is not a fundamental right, these constitutional claims will succeed only if "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Malmed v. Thornburgh,* 621 F.2d 565, 570 (3d Cir.1980) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979)).

The challenged regulation serves an important state interest, that of promoting highway safety. As discussed above, statistics reveal that bioptic drivers generally have higher accident rates than do members of the general driving population. Thus, the regulatory ban on bioptic lenses rests upon a rational factual foundation, and is rationally related to the State's legitimate interest in promoting highway safety. For this reason, the Commonwealth's ban of bioptic lenses does not violate the fourteenth amendment's due process or equal protection clauses.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343.

2. The challenged regulation, 67 Pa. Code § 83.3(f) (1986), does not violate § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

3. The challenged regulation, 67 Pa. Code § 83.3(f) (1986), does not violate the equal protection clause of the fourteenth amendment to the United States Constitution.

4. The challenged regulation, 67 Pa. Code § 83.3(f) (1986), does not violate the due process clause of the fourteenth amendment to the United States Constitution.