**Michael Anthony WILSON**

v.

**PENNSYLVANIA STATE POLICE DEPARTMENT, et al.**

**Civil Action No. 94–6547.**

United States District Court, E.D. Pennsylvania.

March 26, 1997.

Elizabeth K. Ainslie, Special Master, Philadelphia, PA, pro se.

Michael Churchill, Philadelphia, PA, Lisa M. Rau, Kairys, Rudovsky, Kalman & Epstein, Philadelphia, PA, for Michael Anthony Wilson.

Susan J. Forney, Office of Attorney General, Stephanie A. Middleton, Office of General Counsel, Deputy General, Harrisburg, PA, for Pennsylvania State Police Dept., Glenn A. Walt and Wayne Dowling.

## MEMORANDUM

RENDELL, District Judge.

Plaintiff Michael Wilson brings this class action against the Pennsylvania State Police Department, Commissioner Glenn A. Walt, individually and in his official capacity, and Wayne Dowling, the Director of Bureau of Personnel, individually and in his official capacity (collectively, "defendants"), alleging that in rejecting him and all persons similarly situated as candidates for the position of state trooper cadet, defendants acted in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq. (1995), and § 504 of the Rehabilitation Act of 1973 ("the Act"), 29 U.S.C. § 794 (Supp. 1996).

Plaintiff was rejected as a state trooper because he failed to meet the Pennsylvania State Police Department's visual acuity standards, which require state troopers to have uncorrected vision of at least 20/70 in one eye and 20/200 in the other eye. Plaintiff suffers from myopia, commonly known as nearsightedness, such that his uncorrected vision in each eye is 20/150. Plaintiff has submitted the expert affidavit of an optometrist, Dr. Louis Catania, who explains that "what a normally sighted person would be able to see clearly at 150 feet 1away, ... [plaintiff] would have to move up to 20 feet to see." Catania Aff., Plaintiff's Ex. D at 2. Dr. Catania also states that approximately eighty percent of the population has uncorrected vision which is better than that of plaintiff. See id. at 1.

It is undisputed that plaintiff's vision is fully correctable to 20/20 through his use of eyeglasses or contact lenses. However, in his sworn affidavit, plaintiff claims that without such corrective measures, his vision is blurred and unfocused, and he is unable to perform such routine daily tasks as driving, cooking, reading, and caring for his infant son. See Plaintiff's Aff., Ex. C at ¶¶ 6–16. Consequently, plaintiff puts on his glasses first thing in the morning, and wears either his glasses or contact lenses continuously throughout his waking hours. Id. at ¶ 8.

Plaintiff alleges that his myopia constitutes a "disability" entitling him to the protections of the ADA and the Act, and further, that he is qualified, notwithstanding his disability, to hold the position of state trooper. Defendants have moved for summary judgment, claiming that plaintiff has not met his prima facie burden as to either his disability or his qualification for this position.[1]

---

1. In their motion, defendants include the request that I reconsider my July, 17, 1995, decision to

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law, *id.* at 248, 106 S.Ct. at 2510, and all inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying for the Court those portions of the record that it believes demonstrate the absence of dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

### DISCUSSION

In order to sustain a claim under the ADA, a plaintiff must establish:

> (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability.

*Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995); *Chandler v. City of Dallas*, 2 F.3d 1385, 1389–90 (5th Cir.1993) (describing plaintiff's comparable burden under the Rehabilitation Act), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).[2] Only the first two elements of plaintiff's prima facie burden are at issue here, requiring examination of whether plaintiff is disabled, and if so, whether he is qualified to hold the position of state trooper.

### I. Is Plaintiff "Disabled"?

Defendants initially attack plaintiff's claim by arguing that his condition, myopia, is not a disability under the ADA or the Rehabilitation Act. A disability is defined under the ADA as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).[3] In this case, plaintiff bases his claim of disability upon the first and third prongs of the definition: substantial limitation of major life activity and regarded as having such an impairment.

---

certify the plaintiff class. However, I decline to consider this issue at this stage, finding that a request to decertify the class is more appropriately raised in a separate motion for decertification.

2. Since Congress intended that the same legal standards be applied under the ADA and the Rehabilitation Act, the following analysis, discussed in terms of the ADA, will also apply to the Act. *See* 42 U.S.C. § 12117(b) (providing that complaints under both Acts be "dealt with [by the enforcing agencies] in a manner that avoids duplication of effort and prevents imposition of

inconsistent or conflicting standards"); *McDonald v. Commonwealth of Pennsylvania*, 62 F.3d 92, 94–95 (3d Cir.1995) (recognizing the congressional intention that "identical standards were to be applied to both Acts," and citing 42 U.S.C. § 12117(b) as supporting authority).

3. As both parties have acknowledged, the definitions of "disability" under the ADA and the Rehabilitation Act are essentially identical. *See* 29 U.S.C. § 706(8)(B); *McDonald*, 62 F.3d at 95 (noting that "[t]he two statutes have closely parallel definitions of disability").

## A. Substantial Limitation of Major Life Activity

With respect to the first prong, it is undisputed that plaintiff has a visual impairment. *See* Defs.' Memorandum of Law in Support of Motion for Summary Judgment at 4; Plaintiff's Ex. F and G (quoting Defs.' Admissions # 30–31, admitting without qualification that plaintiff has a visual impairment). In order to be considered a disability, however, the impairment must "substantially limit" one or more of plaintiff's "major life activities." 42 U.S.C. § 12102(2)(A).

The regulations which accompany the ADA define the term "substantially limits" as:

[ ]unable to perform a major life activity that the *average person* in the general population can perform ... or ... [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added). *See Schluter v. Industrial Coils, Inc.,* 928 F.Supp. 1437, 1444 (W.D.Wis.1996). The regulations thus direct me to compare plaintiff's circumstances to that of an average person in the population. "Major life activities," though not defined by statute, are defined by regulation as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). *See Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1454 (7th Cir.1995).

Since plaintiff, both in his submissions and during oral argument, has explicitly confined his arguments to the major life activity of "seeing," I will limit my analysis of his disability claim accordingly. *See* Plaintiff Wilson's Response to Defendants' Motion for Summary Judgment at 37 (noting that "[p]laintiff Wilson is claiming that the major life activity that he is substantially limited in is *seeing,* not working"). Plaintiff states in his affidavit that, when left without the use of his eyeglasses or contact lenses, his vision is blurred and unfocused, and he is substantially impaired in his ability to perform a number of daily activities which involve seeing, including driving, cooking, reading, and caring for his infant son. *See* Plaintiff's Aff., Ex. C at ¶¶ 6–16. In fact, plaintiff puts on his eyeglasses "first thing in the morning when [he] wakes up," so as not to go "any length of time without correction," and that he wears his glasses or lenses continuously during his waking hours. *Id.* at ¶ 8.

■ It is conceded that while plaintiff's condition renders him unable to see clearly in his daily life, he can do so with the aid of glasses or contact lenses. A threshold question raised in defendants' motion is this: should the determination as to substantial limitation be made with or without regard to plaintiff's use of eyeglasses or contact lenses? Defendants argue that plaintiff cannot be said to be substantially limited in seeing when, simply by donning eyeglasses or inserting contact lenses, he can perfect his vision to the 20/20 standard.

■ Plaintiff, however, has cited significant authority for the proposition that corrective eyewear should be disregarded in determining disability status. For example, the Equal Employment Opportunity Commission ("EEOC"), the agency charged with issuing regulations to implement Title I of the ADA, *see* 42 U.S.C. § 12116, has spoken to this very issue by setting forth interpretive guidelines which direct, *inter alia,* that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices."[4] 29 C.F.R. pt. 1630 App.

---

4. Aside from defining "substantially limits" as described above, the regulations accompanying the statute are silent as to the particular issue raised by the guideline. The EEOC guidelines are included as an appendix to the regulations, and hence have been generally regarded as distinct from those regulations. *See, e.g., Coghlan v.* *H.J. Heinz Co.,* 851 F.Supp. 808, 811–12 (N.D.Tex.1994) (noting that EEOC guideline was a suggested interpretation separate from the agency's regulations, and unlike legislative or substantive rules, were not binding on the court with the force of law). *See also Appalachian States Low–Level Radioactive Waste Comm'n v.*

§ 1630.2(j). This position is reiterated in the agency's Compliance Manual. *See* EEOC Compliance Manual, Plaintiff's Ex. H, at 902–35. Plaintiff argues that, pursuant to the EEOC guideline, his use of eyeglasses or contact lenses are mitigating measures which should be disregarded in determining whether he is substantially limited by his myopia, so that his corrected 20/20 vision does not defeat his claim of disability.

Significantly, plaintiff also refers this court to numerous portions of the legislative history of the ADA upon which the EEOC guidelines are modelled. For example, one congressional committee report notes that "whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids." S.Rep. No. 101–116, at 23 (1989) [hereinafter Senate Report]. Another committee report echoes this language and adds:

> [f]or example, a person who is hard of hearing is substantially limited in the major life activity of hearing, even though the loss may be corrected through the use of a hearing aid. Likewise, persons with impairments, such as epilepsy or diabetes, which substantially limit a major life activity are covered under the first prong of disability, even if the effects of the impairment are controlled by medication.

H.R.Rep. No. 101–485(II), at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 334 [hereinafter House Labor Report].

Defendants argue that the EEOC guideline in question is not entitled to any weight because it is in conflict with the clear language of the statute. Since the statute requires that plaintiff's impairment "substantially limit[ ] one or more of [his] major life activities," 42 U.S.C. § 12102(2)(A), defendants contend that plaintiff's corrective eyewear must factor into this court's determination and defeat plaintiff's claim that he is disabled.

At least two courts have adopted defendants' position with respect to the EEOC guideline at issue. For instance, in *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808 (N.D.Tex. 1994), the court considered the disability claim of a plaintiff with insulin-dependent diabetes and held that the EEOC guideline was not entitled to any weight in the court's determination. The court found that the EEOC's directive, as "interpretive guidance," reflected only the agency's view on what the statute means, and that such guidance is not binding upon a court with the force of law. *Id.* at 812. The court rejected the EEOC's interpretive gloss on the statute as "requir[ing] that one not having a limitation be considered as having a disability even though the statutory language clearly requires substantial limitation." *Id.* at 813.[5]

In *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1444 (W.D.Wis.1996), the District Court for the Western District of Wisconsin followed the *Coghlan* court and explicitly disregarded the EEOC guideline under circumstances similar to those presented in *Coghlan*. The plaintiff in *Schluter* suffered

*O'Leary*, 93 F.3d 103, 112–13 (3d Cir.1996) (noting that interpretive rules, which are not subject to public notice and comment procedures, merely clarify or explain regulations but are not meant to alter legal rights). Nevertheless, it appears that the guidelines were subject to public notice and comment procedures similar to those which normally apply to regulations. *See* Equal Employment Opportunity for Individuals with Disabilities, 56 Fed.Reg. 8578 (1991) (notice of proposed rulemaking, to be codified in an appendix to 29 C.F.R. pt. 1630) (proposed Feb. 28, 1991); Equal Employment Opportunity for Individuals with Disabilities, 56 Fed.Reg. 35726 (1991) (final rule, to be codified in an appendix to 29 C.F.R. pt. 1630). Thus, the guidelines arguably have more force than would an ordinary interpretive rule. In any event, I note that to the extent the guideline is elaborating upon a

term used in a regulations, *see* 29 C.F.R. § 1630.2(j) (defining "substantially limits"), it is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Doe v. Kohn, Nast & Graf, P.C.*, 862 F.Supp. 1310, 1319 (E.D.Pa.1994) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994)).

**5.** Despite its rejection of the EEOC guideline, however, the *Coghlan* court found that the plaintiff had come forward with enough evidence of substantial limitation to survive defendant's motion for summary judgment. *Id.* at 813–14. Thus, the court only rejected the guideline insofar as it read it to require that insulin-dependent diabetes be considered a *per se* disability. *See id.* at 813.

vision problems as a consequence of her insulin-dependent diabetes, and claimed that she was disabled and terminated in violation of the ADA; the defendant challenged the plaintiff's disability status. Notwithstanding the EEOC's instruction that "a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication," 29 C.F.R. pt. 1630 App. § 1630.2(j), the court rejected the guideline as being in direct conflict with the language of the statute, stating that:

> [i]f an insulin-dependent diabetic can control her condition with the use of insulin or a near-sighted person ·can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the [ADA's] first definition of disability the requirement that it applies only to those persons who are "substantially limited" in major life activities.

*Schluter,* 928 F.Supp. at 1445. The court thus held that the plaintiff's ability to control her disability by the use of medication was properly considered in the disability inquiry to defeat her claim. *See id* at 1445 ("Plaintiff must show. that her diabetes substantially limits her in a major life activity by showing that it affects her in fact, rather than how it would affect her hypothetically if she were unable to obtain insulin.").

■ Defendants urge this Court to adopt the reasoning of *Coghlan* and *Schluter* and reject the EEOC guideline as in conflict with the plain meaning of the statute that an impairment must be "substantially limit[ing]." *See Public Employees Retirement System v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989) ("[N]o deference is due to agency interpretations at

odds with the plain language of the statute itself."). However, I do not find that the text of the statute unambiguously precludes a plaintiff from being considered disabled where he is substantially limited without mitigating measures but is able to use such measures to overcome the substantial limitations which would otherwise flow from his impairment. *See, e.g., Harris v. H & W Contracting Co.,* 102 F.3d 516, 521 (11th Cir. 1996) ("There is nothing inherently illogical about determining the existence of a substantial limitation without regard to mitigating measures ... and there is nothing in the language of the statute itself that rules out that approach."). Although the term "substantially limits" may be unambiguous in and of itself, it nonetheless does not speak to the issue before me; that is, the statute is silent as to whether a substantial limitation is to be considered with or without regard to mitigating measures.[6] Therefore, I do not find that the language of the statute is so plain as to require that I reject reference to the guideline as an aid in interpreting the statute in this context. *See, e.g., Harris,* 102 F.3d at 521. *See also United States v. Dickerson,* 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356 (1940) ("The meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction"); *Doe v. Kohn, Nast & Graf, P.C.,* 862 F.Supp. 1310, 1319 (E.D.Pa.1994) (turning to agency interpretations where the plain language of the statute offered no guidance with respect to the facts at issue).

■ In fact, as a reasonable construction of the statute by the administrative agency charged with enforcement, the EEOC guideline is entitled to great deference, even though it may not be the only permissible construction of the statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense*

---

6. Consider, for example, the analogous case of a patient with a leg injury who requires the use of crutches to be able to walk properly. If this patient's doctor were to ask him, "Are you able to walk down the street?" one can certainly say that the doctor's question, that is, the meaning of the words themselves, is quite clear. However, one would still need to inquire further to know whether the doctor intended for the patient to answer the question with or without regard to his use of crutches. The doctor's question, without more, does not inform the patient as to whether he is being asked whether he can walk down the street on his own without crutches, or whether the doctor wishes to know if the crutches are enabling him to walk down the street. The patient would simply have to know more in order to accurately respond to the doctor's question.

*Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (" 'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, explicitly or implicitly, by Congress' .... [and] a court may not substitute its own construction ... for a reasonable [agency] interpretation ....'" (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974))); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). I have already determined that the statutory term "substantially limits" is not so clear as to render the EEOC's interpretation impermissible. I must therefore defer to the guideline, unless I find that it is inconsistent with the legislative history of the ADA. *See Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783; *Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary,* 93 F.3d 103, 108 (3d Cir.1996) (noting that a "court must defer to [an] agency's construction 'unless it appears from the statute or its legislative history that the [construction] is not one that Congress would have sanctioned'" (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961))).

Even a cursory examination of the legislative history reveals that the guideline is not only consistent with such history, but was actually patterned on specific language drawn from congressional reports. See

House Labor Report at 52 (noting, that "[w]hether a person has a disability should be assessed without regard to the availability. of mitigating measures"); Senate Report at 23 (noting the same). In this particular instance, then, the EEOC guideline is entitled to great deference, because it is reasonable in light of statutory language and is consistent with existing legislative history. *See, e.g., Harris,* 102 F.3d at 521 ("We cannot disregard the [EEOC's] interpretive guidance ... when that guidance is based on a permissible construction of the statute and is supported by the statute's legislative history."). *See also Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1971) (noting that where the statutory language and legislative history support an agency interpretation, "this affords good reason to treat the guidelines as expressing the will of Congress").

Apart from providing support for the agency's construction, the legislative history of the ADA also represents another aid in this Court's statutory interpretation. *See United States v. Dickerson,* 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356 (1940) (noting the value of legislative materials in ascertaining the "meaning to be ascribed to an Act of Congress"). The relevant legislative reports unquestionably reveal that Congress did not intend the statutory term "substantially limits" to negate a disability simply due to an individual's use of mitigating measures.[7] *See* House Labor Report at 52; Senate Report at

---

**7.** The *Schluter* court neglected to even mention, let alone distinguish, the contrary legislative history relevant to its holding. *See* House Labor Report at 52 (stating that "persons with impairments, such as ... diabetes, which substantially limit a major life activity are covered under the first prong of disability, even if the effects of the impairment are controlled by medication"). The *Coghlan* court, on the other hand, acknowledged that it was reaching its decision in the face of contrary legislative history, but justified its holding under Fifth Circuit precedent. *See Coghlan,* 851 F.Supp. at 811 (relying upon *Guilzon v. Commissioner,* 985 F.2d 819, 823–24 n. 11 (5th Cir.1993)).

Even if I agreed with *Coghlan* and *Schluter* and rejected the EEOC guideline as contrary to the plain language of the statute, Third Circuit precedent would require that I consider legislative history in construing the statute in a situation such as this. *See United States v. Knox,* 32

F.3d 733, 744 (3d Cir.1994) (noting that although statutory language is normally to be enforced according to its ordinary meaning, a "most extraordinary showing of contrary congressional intent may justify altering the plain meaning of a statutory term"), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995). *See also Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) ("It is said that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law and does not preclude consideration of persuasive evidence if it exists."). Thus, in light of my determination, as discussed herein, that the legislative history of the ADA overwhelmingly supports the EEOC's interpretation, I would be justified in construing the statute with reference to the guideline even if I found that it conflicted with the language of the statute.

23. I am persuaded that the congressional instruction that "[w]hether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids," plainly applies to the circumstances presented in the instant case. Although Congress did not speak to eyeglasses and contact lenses *per se*, it did contemplate analogous situations which bear on this case. For example, one congressional report directs that "a person who is hard of hearing is substantially limited in the major life activity of hearing, even though the loss may be corrected through the use of a hearing aid."[8] House Labor Report at 52. Likewise, a person with a visual impairment that negates his ability to see should be permitted to establish that he is substantially limited in the activity of seeing, even though he offsets his impairment with eyeglasses or contact lenses.[9]

Defendants make a policy argument with regard to this issue of statutory interpretation, contending that to consider this plaintiff disabled would be an unwarranted expansion of disability laws beyond their intended scope, because he can so easily alleviate the debilitating effects of his disability. *See, e.g., Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir.1986) (noting that the "high purpose" of the Rehabilitation Act, to assure that truly disabled yet capable individuals be protected from discrimination, would be debased if the statute's protections could be invoked by individuals with "minor" and "commonplace" impairments). Plaintiff counters defendants' reasoning with the generally accepted policy that the ADA, as a remedial statute, was intended to be broadly construed. *See, e.g., School Bd. of Nassau County v. Arline*, 480 U.S. 273, 280 n. 5, 107 S.Ct. 1123, 1127 n. 5, 94 L.Ed.2d 307 (1986); *Heilweil v. Mt. Sinai Hospital*, 32 F.3d 718, 722 (2d Cir.1994) (noting that the ADA and the regulations promulgated under it are to be broadly construed), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

Defendant argues on the one hand that plaintiff's myopia is not limiting or unusual as compared with the general population, while arguing on the other hand that he does not have the requisite visual capacity to be a state trooper due to his poor uncorrected vision. There is a certain irony inherent in defendants' argument: if, by virtue of his glasses or lenses, plaintiff is not substantially limited in seeing, how can he nonetheless be too visually impaired—based on his eyes without correction—to satisfy the position of state trooper? Defendants' position may be intuitively attractive, in that most people would not think of an individual as disabled

8. However, I am not also suggesting that such language should be read to support a finding that individuals who are hard of hearing are *per se* disabled, only that their use of a hearing aid does not negate the possibility that they are substantially limited by their hearing impairment. *See, e.g., Coghlan*, 851 F.Supp. at 813 (declining to find that an insulin-dependent diabetic plaintiff had a *per se* disability, but finding that the plaintiff had come forward with enough evidence of substantial limitation to survive defendant's motion for summary judgment).

9. Defendants would be hard pressed to argue that eyeglasses and contact lenses are not "mitigating measures." *See, e.g.,* Defs' Admissions # 40–41 (noting that "[c]orrective lenses ... can mitigate the impact of the impairment on vision"). The example cited in the legislative history reveals that hearing aids were intended by Congress to fall under the rubric of "mitigating measures, such as reasonable accommodations or auxiliary aids," even though hearing aids, like eyeglasses and contact lenses, are not explicitly referenced in the statutory definition of "auxiliary aids" or "reasonable accommodations." *See* 42 U.S.C. § 12102(1) (defining auxiliary aids); 42 U.S.C. § 12111(9) (defining reasonable accommodations).

At least one congressional committee treated eyeglasses as akin to hearing aids, albeit in a slightly different context, in stating that "[t]he Committee [on Education and Labor] wishes to make it clear that *personal use items, such as hearing aids or eyeglasses*, are not included in this provision [regarding reasonable accommodations], and therefore are not required to be provided by employers as reasonable accommodations." House Labor Report, at 64 (emphasis added). Thus, aside from the obvious parallels to be drawn between hearing aids and corrective eyewear such as eyeglasses and contact lenses, the fact that Congress has otherwise explicitly considered these items together reveals its intent that they be treated as analogues.

If Congress intended otherwise, it will no doubt revisit the issue and nullify the legislative history which I have considered here; in fact, given the considerable likelihood that this issue will rear its head repeatedly in future ADA and Rehabilitation Act cases, clarification would be entirely welcome.

if he can alleviate the effects of his impairment by putting on eyeglasses, particularly as compared to an individual who, for instance, is confined to a wheelchair. However, intuition alone does not control this Court's statutory interpretation; rather, I conclude, having considered the statutory language, agency interpretations thereof, and existing legislative history, that the statutory term "substantially limits" should not be interpreted to automatically exclude people like plaintiff whose physical circumstances are limiting, but who use mitigating measures to offset the effects of their impairments.

Having determined that plaintiff's eyeglasses or contact lenses should not factor into the disability inquiry so as to defeat his claim outright, I turn to the question of whether he has otherwise met his burden of establishing that his visual impairment renders him substantially limited in a major life activity. A "substantially limiting impairment" is one which is a "significant" restriction on a major life activity. *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1444 (W.D.Wis.1996). Three factors to be considered in determining whether an impairment is substantially limiting include: "(1) the nature and severity of the impairment; (2) how long it will last or is expected to last; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Sackett v. WPNT, Inc.*, 1995 WL 686708 at *3 (W.D.Pa. Sept.19, 1995) (citing regulation 29 C.F.R. 1630.2(j)(2) as the ultimate source of these factors), *aff'd*, 91 F.3d 125 (3d Cir. 1996). The regulations further provide that a substantial limitation exists if plaintiff is "unable to perform a major life activity that the average person in the general population can perform ... or ... significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to" the average person. 29 C.F.R. § 1630.2(j)(1). I therefore will examine the nature of the impairment on its own and as compared to the average person.

In this case, plaintiff limits his claim of disability to the activity of seeing. In his sworn affidavit, he states that without his glasses or lenses, his vision is blurred and unfocused, and that he is thereby substantially limited in several daily activities which involve seeing, including driving, cooking, reading, and caring for his infant son. *See* Plaintiff's Aff., Ex. C at ¶¶ 6–16. He states that he puts on his eyeglasses "first thing in the morning when [he] wakes up," so as not to go "any length of time without correction," and that he wears his glasses or lenses continuously during his waking hours. *Id.* at ¶ 8. Plaintiff's expert, Dr. Louis Catania, attests that plaintiff has 20/150 binocular uncorrected vision, which means that "what a normally sighted person would be able to see clearly at 150 feet away, ... [plaintiff] would have to move up to 20 feet to see." Catania Aff., Plaintiff's Ex. D at 2. Dr. Catania confirms that a person with plaintiff's level of myopia would suffer substantial limitations without the use of corrective devices. *Id.* at 1. Significantly, Dr. Catania also states that approximately eighty percent of the population has uncorrected vision which is better than that of plaintiff. *Id.*

Defendants maintain that even assuming that plaintiff's eyewear is disregarded, plaintiff has not established that he is substantially limited in the activity of seeing. Although they do not otherwise challenge the factual content of plaintiff's affidavit, they contend that the facts as submitted by plaintiff do not warrant a finding of substantial impairment as a matter of law. They essentially take the position that since myopia is nothing more than nearsightedness, plaintiff's condition cannot be said to be sufficiently rare or severe so as to constitute a substantial limitation, nor can he be said to be significantly restricted in his activities as compared to an average person. *See, e.g., Sweet v. Electronic Data Systems, Inc.*, 1996 WL 204471, at *4 (S.D.N.Y. Apr.26, 1996) ("Physical ... limitations that are both minor and commonplace do not constitute a disability under the ADA."); *Joyce v. Suffolk County*, 911 F.Supp. 92, 96 (E.D.N.Y.1996) ("The need for corrective eyewear could reasonably be characterized as 'commonplace' .... 'minor' and 'widely shared'."); *Venclauskas v. State of Conn.*, 921 F.Supp. 78, 82 (D.Conn.1995) (finding that plaintiff's visual impairment,

leaving him with unaided vision of 20/80 in one eye and 20/120 in the other, was not "unusually severe or rare" so as to be a disability).

In support of their position, they point to several analogous cases in which individuals with visual impairments that they contend were comparable to or more severe than plaintiff's myopia were found not to be disabled. *See, e.g., Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir.1993) (finding that plaintiff with 20/60 vision was not handicapped under the Rehabilitation Act, and relying on precedent which held that vision corrected to 20/200 did not constitute a handicap), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Sweet*, 1996 WL 204471 at *4 (rejecting disability claim of plaintiff with perfect vision in one eye and correctable to 20/80 in the other eye); *Joyce*, 911 F.Supp. at 96 (finding that police officer candidate with uncorrected vision of 20/200 was not disabled); *Sackett*, 1995 WL 686708 at *1 (finding that plaintiff with esotropic strabismus, or crossed-eyes, was not disabled).

I am not persuaded by defendants' argument. First, many of the cases cited by defendants are distinguishable on their facts, because the plaintiffs in those cases simply had not bolstered their claims of being substantially limited to the extent that plaintiff has done so here, or because they conceded the issue altogether. *See, e.g., Chandler*, 2 F.3d at 1390 (noting that plaintiff "testified at length that his impaired vision did not substantially limit any of his major life activities"); *Sweet*, 1996 WL 204471 at *1, 4 (noting plaintiff's concession that he remained able, despite his eye injury, to engage in a number of work requirements and recreational activities including reading, typing, driving (with glasses) and playing golf); *Joyce*, 911 F.Supp. at 93 (noting plaintiff's concession that "he has never

been limited in any activity by his eyesight or blood pressure"); *Sackett*, 1995 WL 686708 at *5 (noting that the "nature and severity of [plaintiff's] impairment, according to his own descriptions, is minimal").

■ Second, defendants' argument that myopia is not particularly "rare" or severe is not controlling on the issue of whether plaintiff is substantially limited in his ability to see; rather, the determination of whether a plaintiff has a substantial limitation under the ADA is an individualized inquiry. *See Forrisi v. Bowen*, 794 F.2d 931, 932 (4th Cir.1986) ("The question of who is a handicapped person under the [Rehabilitation] Act is best suited to a 'case-by-case determination,' . . . as courts assess the effects of various impairments upon varied individuals." (quoting *E.E. Black, Ltd. v. Marshall*, 497 F.Supp. 1088, 1100 (D.Haw.1980))). Accordingly, I will concern myself with the particular facts of plaintiff's claimed limitation, rather than the characteristics generally attributable to individuals with myopia.

On the facts which plaintiff has placed before me through his affidavit and that of Dr. Catania, I find that he has amply supported his claim with affirmative evidence of his substantial limitation in seeing. The contents of his affidavit clearly describe the nature and severity of his impairment and the impact it has had upon those of his daily activities which involve seeing. Since plaintiff has chosen to avoid the risks associated with corrective surgery, *see* Complaint at ¶ 30, and since his eyeglasses can only correct, but not cure, his myopia, *see* Catania Aff., Plaintiff's Ex. D at 2, I can safely assume that plaintiff's condition is not a temporary condition. Moreover, the fact that eighty percent of the population has uncorrected vision better than plaintiff specifically supports his argument that he is significantly restricted in seeing as compared with the average person in the population.[10] *See* 29

10. Defendants could argue that this statistic does not reveal how many of the individuals within that 80% bracket could also argue that they have "substantial limitations" which would render them disabled under the statute. Suppose, for example, that most people in that 80% bracket have uncorrected vision which is only slightly better than that of plaintiff? Indeed, this is pre-

cisely the point made by defendants in their reply brief, when they note that:

[Dr. Catania states] at ¶ 12 [of his affidavit] that schools generally "recommend eyeglasses to someone having less than a 20/40 level of uncorrected visual acuity. *This means that a much greater percentage than 20% of the general popula-*

C.F.R. § 1630.2(j)(1). Given this factual background, the substance of which has not been challenged by defendants, I cannot say that plaintiff will be unable to satisfy his burden at trial that he is substantially limited in the life activity of seeing, and I do find that there exists at least a genuine issue of fact sufficient to withstand defendants' motion for summary judgment.

## B. Defendants Regarded Plaintiff as Having a Substantially Limiting Impairment.

In the alternative, plaintiff bases his claim of disability on the third prong of the statutory definition, alleging that defendants "regarded" him as disabled. *See* 42 U.S.C. § 12102(2)(C); 29 U.S.C. § 706(8)(B)(iii). Although I find that plaintiff has satisfied his burden as to the first prong, that of being "substantially limited" in seeing, I will nonetheless briefly discuss the "regarded as" prong as well.

Under this provision, a plaintiff would be entitled to the protection of the ADA even if he does not actually have a substantially limiting impairment, as long as he can show that defendants regarded him as having such an impairment. *See* 29 C.F.R. § 1630.2(*l*). Where, as here, defendants concede that plaintiff has an impairment, plaintiff must still show that defendants perceived his impairment to be one which posed a substantial limitation on one of his major life activities. *See, e.g., Forrisi,* 794 F.2d at 933. As with his argument under the first prong of the disability definition, plaintiff confines his claim to the major life activity of seeing.

I find that plaintiff has produced a significant factual basis for his claim that defendants perceived his impairment to be substantially limiting. For example, he points out that in challenging his ability to be

a state trooper, defendant stated their belief that someone with his uncorrected visual acuity would be unable to perform a variety of ostensibly routine tasks which involve seeing, including: identifying a person to whom a message is to be delivered; driving visiting dignitaries to locations; driving a patrol car through assigned areas and in "trouble spots" to observe or discourage criminal activity; observing the inside of stopped vehicles; parking a patrol car in a place of safety at an accident scene; driving a patrol car during normal and adverse weather conditions, at varying speeds and at various times of day and night, and in emergency and non-emergency situations; patrolling on foot or by car to maintain law and order; and visually examining dwellings and other buildings for suspicious persons or signs of criminal activity. *See* Plaintiff's Ex. E at ¶ 30a (citing Defs.' Answers to First Set of Interrogatories at ¶¶ 29, 78, 150, 295, 296, 298, 390, 316, and 324). Plaintiff argues that these beliefs reflect defendants' perception that plaintiff's uncorrected myopia substantially limits his ability to see.[11] I find that plaintiffs have at least raised a genuine issue of material fact as to this issue. *See, e.g., Harris v. H & W Contracting Co.,* 102 F.3d 516, 523 (11th Cir. 1996) (finding that, where employer had replaced plaintiff-employee because he felt that "the company was put in jeopardy, [and] at a disadvantage." due to plaintiff's Grave's disease, a genuine issue of material fact existed as to whether employer regarded plaintiff's impairment as being substantially limiting).

Defendants counter that their rejection of plaintiff for the position of state trooper cadet does not in and of itself mean that they regarded plaintiff as having an impairment which substantially limits a major life activity within the meaning of the disability statutes. *See Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986) (acknowledging that several courts

---

tion wears or needs eyeglasses in order to achieve 20/20 vision."
Defs.' Reply Brief at 2–3 n. 1.

In this regard, plaintiff's 80% figure may be less compelling than it appears at first blush. Nonetheless, since on a motion for summary judgment I must resolve all doubt and draw all inferences in favor of the non-movant, I find that the 80% figure at least creates a genuine issue for trial as to whether plaintiff is substantially limit-

ed in his life activities as compared with an average person in the general population.

11. For example, plaintiffs contend that since defendants believe he is unable to drive visiting dignitaries, they would no doubt consider him equally unable to drive his infant son. *See* Plaintiff's Memorandum of Law in Response to Defs.' Motion at 41.

have held "that an employer does not necessarily regard an employee as handicapped merely by finding the employee to be incapable of satisfying the singular demands of a particular job"). They also cite a number of cases which have so held under strikingly similar circumstances. *See, e.g., Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989) (rejecting "regarded as" disability claim of police officer candidate who alleged that he was rejected based on the results of his psychological profile); *Welsh v. City of Tulsa,* 977 F.2d 1415 (10th Cir.1992) (rejecting disability claim of a firefighter with decreased sensation in two fingers); *Joyce v. Suffolk County,* 911 F.Supp. 92, 95 (E.D.N.Y.1996) (rejecting "regarded as" claim of police officer candidate whose uncorrected visual acuity did not meet department standards); *Venclauskas v. State of Connecticut,* 921 F.Supp. 78, 82 (D.Conn.1995) (finding that applicant whose candidacy for state trooper trainee was rejected due to visual acuity did not establish that he was "regarded as" disabled); *Layser v. Morrison,* 935 F.Supp. 562, 568–69 (E.D.Pa.1995) (rejecting disability claim of university security officer who was reassigned from patrol position to dispatch position in light of his mental impairment).

Plaintiff, however, cleverly distinguishes such cases on the grounds that the courts there had focused only on the specific life activity of "working," rather than on the allegedly limited life activity on which plaintiff's argument turns, namely, "seeing." He is correct that each of the cases relied upon by defendant that addresses this issue either explicitly confines its analysis to the life activity of working, or purports to address life activities other than working without otherwise varying its analysis. *See, e.g., Daley,* 892 F.2d at 215 ("Being declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity."); *Welsh,* 977 F.2d at 1417 (noting plaintiff's argument that he was regarded as being substantially limited in working, and rejecting claim because the major life activity of working "does not necessarily mean working at the job of one's choice"); *Joyce,* 911

F.Supp. at 95 (following *Daley* ); *Venclauskas,* 921 F.Supp. at 82 (rejecting plaintiff's claim and focusing solely on major life activity of working, even though plaintiff's claim ostensibly referred to seeing and driving as well); *Layser,* 935 F.Supp. at 568–69 (confining analysis to the major life activity of working).[12] The case law simply does not address a situation such as this, where plaintiff limits his claim of substantial limitation to the activity of seeing and can point to affirmative facts which support a finding that the defendants perceived him as being so limited, *i.e.,* limited in his ability to see. Therefore, I do not find that the applicable case law supports defendants' entitlement to summary judgment on this issue of whether plaintiff was "regarded as" disabled.

In fairness, I should note that defendants are not contending that persons with plaintiff's level of myopia are incapable of performing the aforementioned duties even while wearing corrective eyewear. Instead, their position is founded on the fact—or possibility—that plaintiff's eyeglasses or lenses may be knocked off or dislodged in the course of his duties. *See* Plaintiff's Ex. E (Defs.' Answers to First Set of Interrogatories) at ¶ 30a (noting that persons with plaintiff's level of visual acuity would not be able to perform the acts required of a state trooper "safely and effectively *under all circumstances and conditions under which a trooper is or may be required to act* "). If this were to happen, even plaintiff would have to concede that his vision would become "blurred and unfocused," and that he would be substantially limited in performing the duties of a state trooper. Plaintiff's Ex. C at ¶¶ 6, 7. Nonetheless, in formulating their standards specifically with respect to uncorrected rather than corrected vision, and in stating their belief that someone with plaintiff's uncorrected visual acuity would be incapable of performing the aforementioned tasks, I find it to be at least arguable that defendants perceived plaintiff to be substantially limited in seeing as a result of his myopia. Accordingly, I do not find that de-

---

**12.** To the extent defendants have cited additional, nonbinding authorities with respect to this issue, I do not find them persuasive.

fendants are entitled to summary judgment on this issue.

## II. Whether Plaintiff is "Otherwise Qualified" for the Job of State Trooper

I turn now to defendants' additional argument: that plaintiff has failed to satisfy the second element of his prima facie case, that he is a "qualified individual with a disability," under the ADA such that, "with or without reasonable accommodation, [he] can perform the essential functions of the employment position" which he seeks. 42 U.S.C. § 12111(8); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995) (discussing plaintiff's burden under the ADA). The parallel term under the Rehabilitation Act, "otherwise qualified," *see* 29 U.S.C. § 794(a), refers to "one who is able to meet all of a program's requirements in spite of his handicap" or disability. *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993) (describing plaintiff's comparable burden under the Rehabilitation Act and quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

Without his corrective eyewear, plaintiff would clearly be incapable of performing the duties required of a state trooper. However, plaintiff argues that his use of eyeglasses or contact lenses allows him to perform the essential functions of the job, and thereby renders him qualified for the position despite his myopia.

Defendants do not challenge the fact that plaintiff can see perfectly with eyeglasses or contact lenses. They nonetheless assert, however, that plaintiff's uncorrected visual acuity renders him unable to perform the essential functions of the position of state trooper "safely and effectively *under all cir-*

*cumstances and conditions under which a trooper is or may be required to act."* Plaintiff's Ex. E (Defs.' Answers to First Set of Interrogatories) at ¶ 30a. In short, defendants argue that since state troopers may find themselves in unforeseeable situations in which their eyeglasses or contact lenses fall off or become dislodged in the line of duty, they must be able to function as state troopers even without such corrective aids, and thus must possess a certain minimum level of uncorrected visual acuity. Since this plaintiff fails to meet defendants' minimum uncorrected visual standards, defendants argue that he is unqualified to hold the position of state trooper.[13] *See Chandler,* 2 F.3d at 1393 (noting that "an otherwise qualified handicapped individual is defined as one who 'can perform the essential functions of the position in question without endangering the health and safety of the individual or others'" (quoting *Chiari v. City of League City,* 920 F.2d 311, 317 (5th Cir.1991))).

The crux of this inquiry, then, is whether individuals like plaintiff who wear corrective aids are nonetheless qualified for the position of state trooper. The Third Circuit Court of Appeals addressed a situation somewhat analogous to this one in *Strathie v. Department of Transportation,* 716 F.2d 227 (3d Cir.1983), when it considered whether an individual who wore a hearing aid was nonetheless qualified under the Rehabilitation Act to drive a school bus in light of a Pennsylvania Department of Transportation regulation requiring a certain minimum level of hearing ability without a hearing aid. In determining whether the state's refusal to accommodate the plaintiff's use of a hearing aid was unreasonable, the court considered whether issuing licenses to hearing aid wearers would jeopardize the "essential purpose" of the school bus driver licensing program. *Strathie,* 716 F.2d at 231. Conducting my inquiry along

---

**13.** There also appears to be a dispute as to whether the eyeglasses or lenses are themselves the "reasonable accommodations" referred to in the statute. 42 U.S.C. 12111(9). In his Complaint, plaintiff refers to his eyeglasses and lenses as "accommodations," Complaint ¶¶ 18, 33, but defendants assert that these items are not accommodations as that term is defined or intended under the relevant law. See Defs.' Memorandum at 36–37 n. 10. I find that my inquiry need

not concern whether the eyeglasses or lenses are themselves accommodations, or whether plaintiff merely seeks to have defendants accommodate his myopia by utilizing *corrected,* rather than uncorrected, visual acuity standards. Rather, this peripheral dispute only serves to unnecessarily detract from the ultimate question of whether plaintiff is qualified for the position of state trooper in spite of his myopia.

similar lines, I must determine whether defendants' uncorrected vision standards are related to the essential functions of the position of state trooper.

 Whether plaintiff is qualified for the position of state trooper is a question of fact. *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1986). Therefore, defendants can only prevail on summary judgment if there is no genuine issue of material fact, or if there is no evidence in the record, which would support a jury finding in favor of plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). I find that plaintiff has set forth sufficient facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e).

In support of his argument that he is qualified to be a state trooper, plaintiff points out that he successfully completed of all the phases of the cadet application process (including written and oral examinations) which he had been permitted to undertake,[14] with the exception of satisfying the uncorrected vision standards. Complaint at ¶ 6. Significantly, he notes that there are state troopers currently on the force who wear eyeglasses and contact lenses and who have not been accordingly dismissed; in fact, defendants do not even test the uncorrected visual acuity of incumbent troopers.[15] Understandably, plaintiff argues that if a certain level of uncorrected vision were an essential requirement of the position, incumbent state troopers would be subjected to the same standards as new applicants.

Furthermore, defendants have admitted that they are unaware of any incident in which a state trooper failed to satisfactorily perform his duties as a result of his visual impairment or his use of eyeglasses or contact lenses. *See* Plaintiff's Ex. F and G (quoting Defs.' Admissions Nos. 374–76). Although they concede that plaintiff has produced evidence supporting the claim that the loss or dislodgment of corrective devices is a "relatively uncommon" circumstance, defendants nonetheless contend that they are entitled to summary judgment because "relatively uncommon" is not equivalent to "remote." *See* Defs.' Reply Brief at 5–6; *Strathie,* 716 F.2d at 232 (noting that where "the essential nature of the [school bus driver licensing program] is to prevent any and all *appreciable* risks" from occurring, some safety risks may be considered to be "too remote" to warrant attention under the program).

*Strathie* teaches us that defendants may not prevail on summary judgment where their characterization of the essential purpose of the state trooper position is overbroad. *See* 716 F.2d at 232 ("Although we fully appreciate the [defendants'] concern for the safety and discipline of school bus passengers, we believe the [defendants'] characterization of the essential nature of its licensing program is overbroad."). Although defendants contend that their uncorrected visual standards reflect the essential nature of the job of state trooper, the record does not support this position sufficient to warrant a finding of summary judgment in their favor. Instead, many of the facts brought to light by the plaintiff—including, but not limited to, the prospect of incumbent state troopers with plaintiff's level of eyesight who remain on the job, and the remoteness of the risk that eyeglasses or contact lenses could become dislodged in the line of duty and thereby pose a safety hazard—raise genuine issues for trial as to whether defendants' standards reflect the essential pur-

---

**14.** Plaintiff notes that he "was not subjected to the remaining steps of the application process including the physical performance tests, the background investigation and selection phases after he was rejected for failing to meet [d]efendants' vision standards." Complaint at ¶ 6 n. 1.

**15.** Since defendants admit that they do not test incumbent troopers, there is no evidence as to whether such individuals would pass or fail defendants' uncorrected vision standards. As I am required at this stage to resolve all doubts and make all inferences in favor of the non-movant plaintiff, I will assume that there are incumbent state troopers who match plaintiff's level of uncorrected visual acuity. Defendants nonetheless maintain that they would dismiss any incumbent trooper "who developed a visual impairment that impacted the safe and effective performance of his assigned duties." *See* Plaintiff's Ex. F and G (quoting Defs.' Admissions No. 358).

pose of the state trooper position. Therefore, I conclude that defendants have not established their entitlement to summary judgment on the facts as presented here.